# CIRCUIT COURT OF ROCKINGHAM COUNTY

William S. Stickley

v.

Rockingham County
Board of Supervisors

August 22, 2000

Case No. (Chancery) 16621

BY JUDGE JOHN J. MCGRATH, JR.

This matter is before the Court for a decision on the merits after an *ore tenus* hearing on William S. Stickley's petition asking this Court to find that the decision of the Rockingham County Board of Supervisors denying him the right to operate a game and shooting preserve on his property was unreasonable, arbitrary, and capricious. The basic background and facts of this case are more specifically set out in this Court's earlier opinion in this case rendered on November 13, 1998, *Stickley v. Rockingham County Board of Supervisors*, 47 Va. Cir. 347 (1998), in which this Court held that the Respondents had the authority to ban private shooting preserves in land zoned Agricultural A-2. The issue which was tried in the current proceeding was whether the Board of Supervisors acted in an arbitrary, capricious, and unreasonable manner in denying Petitioner's request for a special use permit for his land.

The petitioner, Dr. Stickley owns a large parcel of land in Rockingham County, Virginia. Rockingham County lies in the middle of the Shenandoah Valley and is largely a rural area consisting of many miles of farmland and

agriculture. More than 47% of Rockingham County land is classified as agricultural. Moreover, four major poultry producers are based in or around Rockingham County; in fact, the county ranks among the top ten nationwide for turkey production. Because of the vastness of the poultry industry in the area, many residents work as "poultry farmers." The individual poultry companies (*e.g.*, Rocco, Wampler-Longacre, Tyson, etc.) will deliver young chicks to the poultry farmers who will house the birds by the tens of thousands in poultry houses. The birds will be "grown" or "grown out" for a period of time and will then be removed by the company for further processing. While the poultry farmers have possession of the birds, they are responsible for their feeding and health.

Birds, like all other animals, are subject to various ailments and illnesses, many of which can be fatal. In an area such as Rockingham County, incidents of avian epidemics are greatly feared because they have the possibility of significantly damaging the poultry growing and processing industry and causing severe economic hardship to the entire area. Avian diseases can be carried into the poultry houses through many means. For example, the flock can come to the poultry house from the hatchery already infected; a human can carry in bacteria or germs on his person when entering a poultry house; or, a wild animal can manage to get inside the house, or rodents and worms can carry germs into the poultry houses. All of these possibilities are guarded against though the practice of "biosecurity." Biosecurity is found in many forms, but in the end, the main purpose is to ensure that diseases are not carried into the poultry house, thus affecting the birds inside. Biosecurity includes doing things as simple as changing clothes and boots before going into a poultry house or spraying all entrants before entering a confined feeding space. Also, the industry generally utilizes what is called "all in, all out" flock control, which means that prior to the birds' going into the house, the poultry house is washed down, sterilized, and disinfected and then all the birds are put in at one time and taken out at one time. The house will not be home to more than one "delivery" of turkeys or chickens during any growing cycle. This ensures that, if one bird is infected, it will only infect that group of birds and not spread it to other flocks. Furthermore, birds in poultry houses are always isolated, with only a handful of workers and technologists being allowed access to the house when birds are present. Without such biosecurity measures, the poultry farmers risk losing a flock or even starting an epidemic in the community (through transmission of the germs/bacteria by other animals or humans).

Avian Influenza is one especially feared disease. It is fatal to the poultry and can be transmitted from wild birds or other poultry to the chickens or

turkeys in the poultry houses or carried from flock to flock by delivery workers or feed delivery trucks. In 1983-84, an avian influenza epidemic swept through the Rockingham County community, destroying a huge number of flocks of poultry. Due to the biosecurity measures practiced today, there has not been a widespread reoccurrence of the dreaded Avian Influenza since 1984.

This case involves a clash between the Board of Supervisors' desire to attempt to minimize the risk of pen-reared birds transmitting avian diseases to commercial poultry flocks with the Petitioner's desire to use his property for raising and releasing pen-reared game birds for sport hunting.

The Petitioner, Dr. Stickley, lives, farms, and raises various birds and farm animals on his Rockingham County farm. Stickley is also a poultry farmer for Rocco; he has one poultry house on a fifteen acre parcel located in the middle of his land which is surrounded by the would be shooting preserve involved in this case. In October of 1997, Stickley applied to the Rockingham County Board of Supervisors for a special use permit to operate a licensed shooting preserve on 100 acres of his privately owned property. On this shooting preserve, Stickley would raise, and release for hunting, chukar, northern bobwhite quail, and ringneck pheasants. When the issue was raised at the Board of Supervisors hearing, they denied Stickley's request for the shooting preserve and ordered that all the game birds currently kept on his property be removed. The Board's reasoning for this decision centered on a concern for the community's booming poultry business and the Board's belief that raising and releasing pen-reared game birds on his land would be a health threat to the poultry housed throughout the county in poultry houses.

The ultimate issue in this case is whether or not the County's decision to deny the special use permit in this case was "fairly debatable." There is a presumption of regularity that attaches to government legislation; if one challenges such actions, he or she must show that the actions taken by the government entity were not regular or were unreasonable. *See City Council of Salem v. Wendy's of West Virginia, Inc.*, 252 Va 12, 14-15. If this is accomplished, it is then the government's burden to show that the issue is "fairly debatable." This means that the government must show that the issue is one that leads objective and reasonable persons to different conclusions. *Id.* The evidence of debatability must be both quantitative and qualitative; "it must be evidence which is not only substantial but relevant and material as well." *Board of Supervisors of Fairfax County v. Williams*, 216 Va. 49, 58 (1975). This law was summarized by the Supreme Court of Virginia as:

210

The following test is employed to determine whether the presumption of reasonableness should stand or fail. "If the presumptive reasonableness of zoning action is challenged by probative evidence of unreasonableness, the challenge must be met by evidence of reasonableness. If such evidence of reasonableness is sufficient to make the issue fairly debatable, the legislative action must be sustained; if not, the presumption is defeated by the evidence of unreasonableness and the legislative act cannot be sustained." *Board of Supervisors of Fairfax County v. Jackson*, 221 Va. 328, 333, 269 S.E.2d 381, 385 (1980) (citing *Board of Supervisors of Fairfax County v. Snell Constr. Corp.*, 214 Va. 655, 659, 202 S.E.2d 889, 893 (1974)).

*City Council of Salem v. Wendy's, supra*, at 15.

In the case at hand, this Court finds that Petitioner has clearly carried his burden of proving "unreasonableness." The vast majority of evidence submitted to the Court in this case was by the Petitioner. He presented three different experts, who all stated that although it is true that avian influenza (AI) *could* be transmitted from upland game birds to poultry, there have been *no* reported cases of AI or any other fatal disease such as this moving from pen-reared game fowl to commercial poultry. (Tr. 288-94, 351, Ex. 35, p. 13.) Also notable is the fact that Petitioner's experts, not the County's experts were all, *state or government* employees: Robert Duncan is a Certified Wildlife Biologist and Director of the Wildlife Division of the Virginia Department of Game and Inland Fisheries (Tr. 255-60), Dr. Gabriel Meza is a veterinarian with the Virginia Department of Agricultural Services (Tr. 351); Dr. Ronald G. King is a veterinarian for the Virginia Department of Agriculture and Consumer Services (Tr. 322); and Dr. Olson is the state Veterinarian for the Maryland Department of Agriculture. (Ex. 35.) All of the experts offered by the Petitioner stressed the importance of biosecurity and the fact that if biosecurity is breached, then diseases can be transmitted. As long as the poultry is contained within the poultry house with proper biosecurity measures and the game birds have no direct contact with them, the presence of game birds is not a risk that is recognized. (Tr. 316.) If biosecurity is not breached, the flocks should be disease-free, unless, of course, they came into the poultry house already infected. (Tr. 291-94, 344-45, 367.)

Secondly, Petitioner has showed that the real, significant threats to the poultry are the migratory waterfowl that are not, and cannot, be controlled by the government. (Tr. 292-94.) In fact, Dr. King testified that it was migratory waterfowl that was the origin of the AI infection that was found at a farm in

Linville in the County a couple of years back. (Tr. 330-33.) In that case, Dr. King found that breaches in biosecurity had occurred, either by the farmer or the workers and as a result, the AI was transmitted from a farm pond into the poultry house. (Tr. 334.) The mode of transmission appears to be the feces of migratory water fowl, which can contain the avian influenza. This feces is usually dropped near farm ponds and if it gets on the boots of the poultry workers or farmers and they enter a poultry house without changing boots or scrubbing or spraying their feet with a sterilizing agent, the avian influenza can contaminate the entire flock.

Finally, the Petitioner has established that biosecurity measures are put in place and utilized by everyone in the commercial poultry industry to guard against infection from migratory birds and water fowl and have been proven to be highly successful against virtually all potential infectious agents. Therefore, such measures obviously would also be highly successful against infection from pen-raised birds and upland game birds. All the experts that testified acknowledged that the incidents of AI outbreaks were caused by careless employees who breached the biosecurity measures. (Tr. 349.) Moreover, the evidence offered by Petitioner was uncontradicted to the extent that it established Dr. Stickley's high level of biosecurity and concerns for his own poultry house. Dr. Stickley testified that he never goes into the poultry house himself; he has an employee who does that for him. This employee has no contact with the upland game birds that are pen-raised on Stickley's property. Therefore, there is no risk of either Stickley or his employee carrying any kind of virus or other germ from the pen-raised upland game birds on his property into his poultry house. Furthermore, his employee practices strict biosecurity dictated by Dr. Stickley himself and by his processor, Rocco. During his ten years of raising poultry, Stickley's birds have only been infected once; that was a case of blackhead disease that originated from worms or rodents that managed to get inside his poultry house. (Tr. 147.) He maintains a 97.5% livability rate for his poultry. (Tr. 147, 235.) Furthermore, Dr. Stickley's game birds have not had any disease problems, and he buys all of his game birds from certified growers so that the eggs are salmonella and typhoid free. (Tr. 150.) Finally and probably most noteworthy is the fact that Rocco, a major turkey processor, for whom Dr. Stickley raises turkeys does not object to his rearing the pen-raised game birds on his land adjacent or near to his poultry houses. Although Rocco's position on this issue is not determinative of whether or not the Respondents acted reasonably, it is enlightening and instructive.

Finding that the Petitioner has carried his burden of proving the unreasonableness of the County's actions, the burden then shifts to the County

to show that the issue is fairly debatable. The County's evidence concerning their decision to deny the permit to Dr. Stickley consisted of the testimony of Dr. Kurshinskie, a corporate veterinarian for Wampler Foods. (Tr. 617.) Dr. Kurshinskie testified that game birds are "capable" of transmitting various infectious diseases, including AI to poultry. She further stated that AI can be transmitted through airborne transmissions and nasal, respiratory excretions and feces, and that game birds "milling around" outside of a poultry house are a significant risk to the poultry. (Tr. 624, 628-29.) Finally, and perhaps most importantly, Dr. Kurshinskie stated that water fowl are *the* major risk of AI contamination; however, game birds are also carriers of it. (Tr. 635.)

Although the County has proven to this court that it is *biologically feasible* to transmit AI and other infectious diseases to poultry from pen-raised upland game birds, the County has failed to establish that such action is a *real* or practical threat to the industry. The general consensus of the myriad of experts who testified in this case is that while it is true that the upland game birds can transmit AI, they present no more of a threat than migratory waterfowl or any farm animal do. In fact, the County's own expert stated that *the* major risk of AI contamination is the migratory waterfowl. If the biosecurity measures practiced by the poultry industry can guard against infection from them, it can guard against infection from upland game birds. Finally, nearly every expert that testified stated he or she knew of no specific instances in which AI or any other disease was transferred from upland game birds to poultry.

For example, Robert Duncan, a wildlife biologist with the Virginia Department of Game and Inland Fisheries, testified that there are eight holders of wild bird permits in Rockingham County and sixteen in the counties surrounding Rockingham. (Tr. 274.) The following question and answer were exchanged between counsel and Mr. Duncan during the trial:

Q: Is there any documented harmful effect to poultry operations because of the raising and releasing of game birds over the years?. . .

A: None that I'm aware of in the 22 years that I've worked with the department.

(Tr. 288.)

Mr. Duncan later elaborated on this answer by stating:

The Department's [of Game and Inland Fisheries] position is that there's neither a realistic nor a documented case where capture reared

game birds have caused the disease outbreak in domestic poultry given where they are separated by the confinement and biosecurity that's presently employed.

(Tr. 291.)

Dr. Gabriel Meza, who has been the Poultry Diagnostition for the Virginia Department of Agriculture since 1984 is employed in the lab in Harrisonburg, where he constantly monitors all types of birds for disease. In part of his testimony, the following exchange took place:

Q: If the avian influenza virus is readily recoverable from the migratory water fowl, is it [also] readily recoverable from ground-feeding game birds like pheasants and other — do you find it in those confined birds?

A: I have never found it there.

(Tr. 364.)

The County's expert witness, Elizabeth Ann Kurshinskie, D.V.M. and Ph. D., who is the corporate veterinarian for Wampler Foods, a large integrated poultry processor, testified as to the various sources of avian disease. Dr. Kurshinskie's testimony was that confined poultry flocks are a susceptible population of birds who can, as a matter of animal physiology contract serious avian diseases from pigs, man, other mammals, ducks, geese, ostriches, emus, and starlings. (*E.g.*, Tr. 643, 657.) In fact, all wild birds and song birds (e.g., starlings, finches, crows, etc.) are "reservoirs" of avian diseases that *may* be transmitted to poultry flocks. In short, according to Dr. Kurshinskie, all humans, equipment, and virtually all animals which are near confined flocks of poultry present a *risk* of infection to the poultry.

However, when asked if she could point to any example in Virginia of pen-reared game birds transmitting disease to poultry, she could cite to none.

Q: [D]o I understand you to say that you haven't documented any kind of disease outbreak in the game birds that are raised around here in Rockingham County that have affected the poultry? Is that correct?

A: I have not documented any of those . . . no, I haven't documented any of those cases.

(Tr. 662.)

The view that all living organisms present a disease transmission threat to poultry flocks proves too much. Innumerable farm, wild and pet mammals, and birds are present in the county and not kept away from commercial poultry houses. The mere fact that pen-reared game birds may present a risk equal to that presented by nearly all other life forms cannot justify their being singled out for special negative government action.

Because the County must provide evidence that establishes either an actual or a "fairly debatable" threat and not the mere theoretical possibility of a threat, in order to show the issue is fairly debatable, this Court finds that the County has not carried its burden in this case. An issue is not "fairly debatable" within the meaning of the case law merely because it involves issues of abstract scientific speculation or debate. Therefore, this Court finds that the action of the County Board of Supervisors was one that was not fairly debatable and was thus unreasonable, arbitrary, and capricious, and the County's denial is hereby dismissed.

The Clerk of the Court is directed to send certified copies of this order Bonnie L. Paul, Esq., Counsel for Petitioner, and G. Chris Brown, Esq., Counsel for Respondent.